IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

CIVIL DIVISION: Ft. Myers

UNITED STATES OF AMERICA
*ex rel.*
ERIC VENSEL, M.D.

CASE NO.

Relator

**TO BE FILED IN
CAMERA AND
UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

NAPLES COMMUNITY HOSPITAL, Inc.
NCH HEALTHCARE SYSTEM, Inc.
NCHMD, INC. AND
AND JOHN DOES 1-100

Defendants.

**RELATOR'S COMPLAINT UNDER
THE FEDERAL FALSE CLAIMS ACT**

**Introduction**................................................................................................................ **3**

**Parties**.......................................................................................................................... **7**

**Jurisdiction and Venue**............................................................................................... **8**
   Background to NCH's Violations of Federal *Stark* Laws ............................................9
   NCH's Shift in Strategy to Boost Hospital Revenues by Eliminating Competition for
   Referrals and Rewarding Referrals to NCH Hospitals and Clinics ..........................10
   NCH Has Excessively Paid Cardiologists Based in Part on the Value of Their Referrals to
   NCH Hospitals and Clinics .....................................................................................13
   NCH Has Excessively Paid Orthopedic Surgeons Based in Part on the Value of Their
   Referrals to NCH Hospitals and Clinics...................................................................16
   NCH Has Excessively Paid Physicians in Numerous Other Specialties Based in Part on
   the Value of Their Referrals to NCH Hospitals and Clinics .....................................18
   NCH's Excessive Payments to Certain Employed Physicians Have Generated Losses of
   Over 60 Million Dollars During the Last Five Years.................................................20

NCH Has Violated Federal *Stark* Laws ............................................................................ 21

The *Stark* Statute's Broad Definition of "Referral" ...................................................... 24

A Bona Fide Employment Relationship Must Satisfy Four Primary Requirements .......... 25
    Physician Compensation Must be "Consistent with the Fair Market Value of the
    Services" Personally Performed by the Physician ....................................................25
    Physician Compensation Must Not be "Determined in a Manner that Takes into Account
    (Directly or Indirectly) the Volume or Value of Referrals by the Referring Physician" ..............27
    The *Stark* Statute Requires that Physician Compensation Must be "Commercially
    Reasonable Even if No Referrals Were Made to the Employer" ..................................................27

The Anti-Kickback Statute Also Mandates that a Hospital's Payments to an
Employed Physician Must be Consistent with the Fair Market Value of the
Physician's Services and Must Not Take Into Account the Volume or Value of
Referrals to the Hospital ....................................................................................... 28

Federal Healthcare Programs ......................................................................................... 30
    Introduction to the Medicare Program ........................................................................30
    Introduction to Medicaid Program ..............................................................................36
    Introduction to TRICARE .............................................................................................37
    Introduction to the False Claims Act ...........................................................................39
    Certifying Compliance with the Federal Stark Laws and Anti-Kickback Statutes Is
    Condition of Payment Under Federal Healthcare Programs and False Certifications are
    Actionable under the False Claims Act .......................................................................43

Count I—Federal False Claims Act 31 U.S.C. § 3729(a) (1)(A) ........................................... 45

Count II—False Claims Act 31 U.S.C. § 3729(a)(1)(B) Use of False Statements ................... 46

Count III—31 U.S.C. § 3729(a)(1)(C) Conspiring to Submit False Claims ............................ 47

Count IV—Submission of Express and Implied False Certifications in Violation of
31 U.S.C. § 3729(a)(1)(B) .................................................................................................. 48

Count V—Knowingly Causing and Retaining Overpayments in Violation of 31
U.S.C. § 3729(a)(1)(G) ....................................................................................................... 49

Count VI—U.S.C. § 3729(a)(1)(G) False Record to Avoid an Obligation to Refund ........... 50

Prayers for Relief ............................................................................................................. 51

## Introduction

1.    Under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("FCA"), Eric

Vensel, M.D. states his Complaint against Defendants Naples Community Hospital, NCH

Healthcare System, NCHMD, Inc. and John Does 1-100 (collectively referred to as "NCH") filed

under seal with the Court as follows.

2.      This *qui tam* case is brought against NCH for knowingly defrauding the federal government in connection with Medicare, Medicaid, Tri-Care, and other Federal Healthcare Programs. As alleged below, since September of 2010, NCH has engaged in a scheme to pay improper compensation to certain employed physicians to reward or induce them illegally to refer patients, including Medicare patients, to NCH hospitals and clinics.

3.      By way of introduction, the department of surgery and the related surgical disciplines in most community hospitals are responsible for substantial annual profit margins generated by the hospital. That fact is true at NCH.   Revenues from perioperative services or ancillary revenues related to surgical procedures account for a major portion of annual profits at NCH.

4.      NCH has excessively compensated specialists who are more profitable in producing ancillary hospital revenues. Such specialties include orthopedic surgery and cardiology among others.

5.      NCH has paid their employed physicians at levels to generate losses in excess of 60 million dollars over the last 5 years. Such losses have been more than offset by revenues from referrals by such physicians that are tracked and monitored by NCH's executives.

6.      Physicians with whom NCH has entered into illegal financial relationships that include unlawful kickbacks or excessive payments refer large volumes of patients, including Medicare and Medicaid patients, to NCH hospitals and clinics in violation of federal law. NCH has submitted and continues to submit false or fraudulent claims based on these referrals to the United States to obtain millions of dollars in Medicare, Medicaid, and TriCare payments that they were not legally entitled to receive.

7.      Further, despite knowing that millions of dollars in payments from the Federal Government have been received in violation of the *Stark* statute's prohibition on receipt of

4

payments, NCH has failed to refund these payments as required by the *Stark* statute. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)(2009), this conduct constitutes a knowing and improper avoidance of an obligation to transmit money to the government.

8.     To conceal their unlawful conduct and to avoid refunding payments made on false claims, NCH also falsely certified, in violation of the False Claims Act, that the services identified in its annual cost reports were provided in compliance with federal law, including the prohibition against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the government, were part of NCH's unlawful scheme to defraud federal healthcare programs.

9.     Payments from the Medicare Program account for approximately 54-55 percent of NCH's net revenues each year. Payments from the Medicaid Program account for another 7-8 percent of net revenues each year.

10.     In the past 5 years, NCH has received approximately $700 million in payments from the Medicare Program.

11.     Prior to enactment of the *Stark* Laws, "there were a number of studies…that consistently found that physicians who had [financial relationships with]…entities to which they referred, ordered more services than physicians without those financial relationships…" 66 Federal Register 859 (January 4, 2001). "This correlation between financial ties and increased utilization was the impetus for section 1877 of the Act." 66 Federal Register 859 (January 4, 2001).

12.     Recognizing the conflict of interest present when a physician refers a patient to a medical facility in which he or she has a financial relationship, the federal government has enacted laws and regulations designed to prevent the overutilization of healthcare services.

5

13.    The *Stark* laws prohibit the United States from paying for Designated Health Services ("DHS") prescribed by physicians who have improper financial relationships with the DHS provider. In addition to prohibiting the hospital from submitting claims under these circumstances, the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[1]

14.    A hospital employing and compensating a physician who refers patients covered by Federal Healthcare Programs to that hospital must satisfy the statutory exception for "bona fide employment relationships."

15.    Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following three relevant requirements: (1) "the amount of the remuneration under the employment....is consistent with the fair market value of the services" personally performed by the physician, (2) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (3) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2). All three of these requirements are mandatory under Federal *Stark* Laws.

16.    In compensating certain employed orthopedic surgeons, cardiologists, and other clinicians making substantial referrals of inpatient admissions and outpatient procedures to NCH hospitals and clinics, NCH has deliberately and repeatedly violated all three of these

---

[1] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

requirements mandated by Federal *Stark* Laws.

17.    Under the federal False Claims Act, on behalf of the United States, Dr. Vensel seeks to recover all available damages, civil penalties, and other relief arising from NCH's conduct described in this Complaint.

## Parties

18.    Relator Eric Vensel, M.D. is an interventional radiologist who has practiced medicine in Naples, Florida since 2006.

19.    Through his work and experience, he has direct, personal and independent knowledge that NCH has violated Federal *Stark* and Anti-Kickback Laws as described in detail below.

20.    Defendant Naples Community Hospital, Inc. is a community hospital system located in Collier County, Florida. NCH consists of two hospitals with a total of 713 beds. NCH includes 617 acute care beds, a 54-bed rehabilitation unit, 19 NICU beds, and a 23 bed psychiatric unit. The downtown NCH campus is a 391-bed acute care facility and the North Naples campus is a 322-bed acute care facility. NCH also has a blood center and various outpatient centers located throughout the region.

21.    NCHMD, Inc. aka NCH Physician Group is a wholly owned subsidiary of Defendant NCH Healthcare System.  NCHMD, Inc. is the corporate entity that employs physicians at NCH hospitals and clinics as part of the NCH Healthcare System.  Naples Community Hospital has determined and paid all compensation to the employed physicians.

22.    Naples Community Hospital is a wholly owned subsidiary of Defendant NCH Healthcare System, Inc.

23.    The identities of the remaining Doe defendants who knowingly submitted or caused the

7

submission of false claims to the United States are presently unknown to Dr. Vensel. All listed Defendants and such additional Doe defendants have served as contractors, agents, partners, and/or representatives of one and another in the submission of false claims to the United States and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described below.

### Jurisdiction and Venue

24.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

25.    Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as Defendants can be found, reside, transact business, or otherwise engaged in the illegal conduct at issue within the District.

26.    This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

27.    Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

28.    Relator has filed this action within the 6-year statute of limitations under the False Claims Act. As discussed below, this action seeks recovery under the False Claims Act for violations of Federal *Stark* and Anti-Kickback Laws with respect to NCH 's claims for payment by Federal Healthcare Programs from 2011 through the present.

8

29.    Prior to filing this case, Dr. Vensel, through his counsel, delivered a copy of the Complaint and his written disclosures of substantially all the material evidence and information in his possession to the United States Attorney for the Middle District of Florida and the United States Attorney General.

### Background to NCH's Violations of Federal *Stark* Laws

30.    When Dr. Vensel moved to Naples in 2006, there were 2 major hospital systems in Collier County. The dominant system was and is NCH with its flagship hospital in downtown Naples and its second hospital at the north end of town. The NCH hospitals lie on the west side of town near the water.

31.    The other major hospital system in Naples is Physicians Regional Hospital on the east side of town near I-75. Physicians Regional Hospital is owned by Community Health Systems. The larger Physicians Regional facility has approximately 101 beds. The smaller Physicians Regional facility at Collier Blvd has approximately 100 beds.

32.    When Dr. Vensel moved to Naples in 2006, many physicians were part of a multi-specialty group known as Anchor Health. The rest of the medical community was comprised of independent physician groups and individual practices of various sizes.

33.    When Dr. Vensel joined Naples Radiologists, P.A. in 2006, that group had an exclusive contract to provide all radiology services to the NCH facilities. Additionally, Dr. Vensel's group co-owned 3 outpatient imaging centers with NCH. These imaging centers are called Naples Diagnostic Imaging Centers (hereinafter "Naples Diagnostic").

34.    The partners of Naples Radiologists hold 50% of the shares of Naples Diagnostic and NCH holds the other 50% of the shares. The partners of Naples Radiologists provide all imaging for Naples Diagnostic and manage the company.

9

35.    Naples Radiologists' partnership with NCH was successful for over 20 years until 2010.

36.    Beginning in late 2010, NCH's financial strategists implemented a strategy to increase referrals to NCH facilities and eliminate competition for such referrals.

### NCH's Shift in Strategy to Boost Hospital Revenues by Eliminating Competition for Referrals and Rewarding Referrals to NCH Hospitals and Clinics

37.    In September of 2010, NCH purchased the largest multi-specialty physician group in Naples, Anchor Health. The Anchor Health group was laden with debt and falling behind financially. Anchor Health also had its own radiology department purchased by NCH.

38.    NCH's acquisition of Anchor Health was a two-part strategy to (1) boost hospital revenues by controlling and rewarding Anchor Health physicians based on the value of referrals, and (2) to weaken or eliminate competition for referrals in the Naples community.

39.    As part of NCH's executives' scheme to conceal their strategy, they imposed strict non-disclosure requirements on employed physicians with respect to their compensation terms.

40.    In an effort to eliminate competition and increase radiology referrals, Allen Weiss (CEO of NCH), Kevin Cooper (Chief Counsel), Phil Dutcher (COO), and Vikki Orr (CFO) began a series of meetings with Dr. Vensel's radiology group (Naples Radiologists, P.A.) to sabotage prior agreements.   Among other things, the NCH executives began reneging on previously agreed upon fees that Naples Radiologists were paid for Naples Diagnostic's management and billing services.

41.    NCH's executives also threatened to terminate the contract with Naples Radiologists despite the prior agreement for Naples Radiologists to provide radiology services to NCH at zero cost to them. Naples Radiologists collected only the professional fees for their radiology services and paid for night coverage out of their own pockets.

42.   At this time Naples Radiologists consistently scored as one of the highest-ranking services in the hospital according to internal surveys by the medical staff. Naples Diagnostic had also received multiple awards for being the top-rated imaging center in the region.

43.   Yet NCH's executives scheduled a meeting with radiologists at Naples Diagnostic and made a misleading presentation to portray Naples Diagnostic as a financial failure. At this meeting NCH's Chief Operating Officer, Phil Dutcher, also contrived criticism of the quality of care being provided by radiologists at Naples Diagnostic.

44.   NCH's executives "offered" for NCH to purchase Naples Radiologists' share of the imaging centers at pennies on the dollar.  NCH's "offer" to purchase Naples Diagnostic was for less cash than the company had in the bank and nowhere near any realistic fair market valuation of the imaging center.

45.   NCH's executives told Naples Radiologists that if they did not agree to this "offer," NCH would terminate the hospital contract with Naples Radiologists. NCH attempted to force Naples Radiologist to sell their interest in the imaging centers so that NCH could expand its control of radiology revenues and radiology referrals in the region.

46.   When Naples Radiologists refused to agree to NCH's offer and threat, NCH terminated Naples Radiologists' contract and services at NCH. NCH brought in a new radiology group known as Franklin and Seidelman and now known as Radisphere. Radisphere had been fired by Physicians Regional Hospital due to poor patient care and patient complaints.

47.   The termination of Naples Radiologists for reasons unrelated to service or medical care was widely opposed in the medical community at NCH. Dr. Kenneth Bookman, an intensivist and Board member at NCH, and Dr. Paul Dernback, a neurosurgeon and the Chief of Staff at NCH, led efforts to oppose the removal of Naples Radiologists. A majority of the medical staff

11

signed a petition supporting the reinstatement of the radiologists.  NCH's executives ignored these efforts and sought to silence those leading the opposition.

48.     Since hiring Radisphere, NCH has received numerous ongoing complaints by the medical staff about the quality of care provided by Radisphere. The radiology department has consistently ranked as one of the worst departments at NCH. Nevertheless NCH mandates that all of their employed physicians refer their patients to the NCH imaging centers even when patient care is compromised. NCH has instructed employed physicians that they must send all of their patients to NCH imaging facilities if they wished to stay employed.[2]

49.     NCH's executives targeted Naples Radiologists in an effort to increase radiology referrals and eliminate competition for these referrals.  It was not only a tactic to capture more imaging revenue, but it was also a way to send a message to the rest of the medical staff of what will happen if a physician does not cooperate with their strategy to control and increase referrals to NCH hospitals and clinics.  All the while, NCH has slowly grown their own radiology imaging centers that started out as Anchor Health.

50.     During the last five years, NCH's executives have a history of targeting physicians who did not "cooperate" with their strategies to increase referrals to the NCH healthcare system.  Dr. Vensel has provided details of such tactics by NCH to the Department of Justice.

51.     Starting with the acquisition of Anchor Health's physicians, NCH's scheme was to entrap physicians into their referral web. This plan only worked if the NCH financial strategists achieved two goals: control over the referrals and leverage over the physicians. Radiology became one target for NCH's strategists. There was no legitimate reason---service quality or

---

[2]  NCH's mandate to refer all patients to NCH imaging centers has violated 42 C.F.R. § 411.354(d)(4)(iv)(B) which states that any requirement to refer to a particular provider does not apply if "the referral is not in the patient's best medical interests in the physician's judgment."

medical care--- to get rid of Naples Radiology, as these physicians were providing a high level of service and first-rate medical care.

52.     NCH sought to control the outpatient imaging centers and therefore control the entire radiology referral revenue stream. When the radiologists refused NCH's tactics and economic pressures, NCH replaced Naples Radiology with an inferior level of service at no real cost savings.

53.     In the end, NCH achieved control over radiology referrals. They have subsequently implemented similar strategies with other departments, including ER, pathology, and anesthesiology.

54.     NCH's executives have implemented a related strategy to capture and control referrals from the clinical decision-makers in a position to order surgeries and procedures that generate lucrative revenues for NCH. That strategy is discussed below.

### NCH Has Excessively Paid Cardiologists Based in Part on the Value of Their Referrals to NCH Hospitals and Clinics

55.     Within NCH's scheme there are two classes of employed physicians: (1) physicians with clinical decision making authority to refer significant numbers of patients for inpatient admissions and outpatient procedures and (2) physicians without such authority. This Complaint addresses NCH's compensation of physicians with clinical decision making authority to refer patients for inpatient admissions and outpatient procedures.

56.     NCH has recruited and employed surgeons with a focus on employing certain surgical specialists who are more profitable in producing ancillary hospital revenues for perioperative services. Such specialties include orthopedic surgery and cardiology.

13

57.   NCH's strategy has been to lure cardiologists into employment with inflated salary offers based on projected referrals and then pressure them for more referrals if the revenues from referrals didn't offset the inflated salaries.  When one cardiologist identified for the Department of Justice could not generate enough referral revenues for NCH to justify his inflated salary, NCH pressured him for more referrals, threatened to cut his pay, and eventually ousted him from employment.

58.   NCH's financial strategists have focused on capturing, controlling, and increasing the lucrative referral revenues from cardiac referrals and rewarding cardiologists within this referral revenue stream.

59.   For example, one cardiac electro-physiologist was the main EP provider for NCH and also on the Board.  NCH's financial strategists wanted him to become an employee of NCH so that they could require the NCH cardiology group to send all electrophysiology studies to him and NCH would thereby control the lucrative revenue stream from EP studies.

60.   NCH offered to double his salary, an offer that could only have been made based on his anticipated referral revenue stream. He declined due to his concerns about NCH's strong-arm tactics to control referrals and punish any competition for referrals.

61.   Year after year, NCH has paid employed cardiologists at inflated levels in consideration of referrals. This strategy generated annual losses of approximately 3 million dollars if referral profits were not considered.  Year after year, NCH has offset losses from cardiologists' salaries with gains from the hospital's revenues from referrals. NCH planned for such losses while tracking, monitoring, and pressuring cardiologists for offsetting referral revenues.

62.   In its Form 990 submissions to the IRS, NCHMD, Inc. has misleadingly attempted to portray these losses as evidence of "charitable healthcare." The reality is that the losses are not

due to charitable care, but rather due to NCH's deliberate over-compensation of the employed cardiologists to induce and reward referrals. The actual charity care being provided by employed cardiologists at NCH was minimal.

63.    The significant annual losses from the cardiology practice group at NCH were due to the moderate collections for the cardiologists' personal services as compared to the excessive compensation. For example, for Fiscal Year ending September 30, 2013, the Cardiology Department at NCH generated revenue of approximately $8.8 million, yet their expenses (primarily physician payroll) were nearly $12 million. For Fiscal Year ending September 30, 2014, the Cardiology Department generated revenue of approximately $10.2 as compared to expenses (primarily physician payroll) over $13 million.

64.    Despite the losses, NCH has continued to pay employed cardiologists at excessive levels. For example, in 2014, NCH paid Dr. David Axline, an interventional cardiologist, in excess of $920,000. The national 90th percentile compensation for interventional cardiologists employed by hospitals was $826,933 in 2013 and the median compensation was $587,109 according to MGMA Physician Compensation and Production Survey data.[3] The MGMA data is not yet available for 2014, but the compensation numbers should be close to the previous year.

65.    Because of the lucrative revenues from referrals, the employed cardiologists at NCH have received preferential treatment from NCH's executives. NCH's executives have given employed cardiologists control over their work schedules so that they are generally not required to be at the hospital after 5:00 p.m. each day. Remuneration is not limited to cash under federal laws: giving

---

[3] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are the leading benchmarking resource for physician compensation in the United States.

extra free time to cardiologists is a form of compensation. Their work hours do not reflect personal production at high levels to justify high compensation. NCH has required the critical care physicians (who do not generate referrals at the level of cardiologists) to cover any cardiology care issues after 5:00 pm so that the employed cardiologists can finish their work early each day.

66.    While low-referring critical care physicians were handling these cardiology issues for no extra compensation, NCH paid high-referring cardiologists call stipends when they did work extra hours for medical issues not handled by critical care.

67.    Three well-respected critical care physicians identified to the Department of Justice recently left NCH because of this preferential compensation of cardiologists who are significant referral sources at NCH.

## NCH Has Excessively Paid Orthopedic Surgeons Based in Part on the Value of Their Referrals to NCH Hospitals and Clinics

68.    Likewise, year after year, NCH has over-compensated their employed orthopedic surgeons for referrals. This scheme generated losses of approximately 1 million dollars or more per year.

69.    The significant annual losses were due to the moderate collections for such orthopedic surgeons' personal services as compared to the excessive compensation paid in consideration of referrals.  For example, for Fiscal Year ending September 30, 2013, the orthopedic surgeons at NCH generated revenue for their services of approximately $4.9 million yet their expenses (primarily physician payroll) were over 6.2 million.

70.     Despite the losses year after year, NCH has compensated employed orthopedic surgeons at levels far in excess of the national 90th percentile.

71.     When NCH purchased Anchor Health, two orthopedic surgeons were included: Dr. Kapp and Dr. Dounchis.  Since the purchase, the compensation of these two orthopedic surgeons has escalated to levels way beyond their compensation at Anchor Health.

72.     In 2013 and 2014, NCH paid Dr. Howard Kapp over $2.2 million dollars each year which was *nearly double the national 90th percentile* for hip and joint orthopedic surgeons in the United States.

73.     In 2013, according to the Medical Group Management Association Physician Compensation and Production Surveys, for hip and joint orthopedic surgeons employed by hospitals the national 90th percentile compensation was $1,206,711 and the national median compensation was $648,110.  NCH paid Dr. Kapp over $2.2 million.

74.     In 2014, according to the Medical Group Management Association Physician Compensation and Production Surveys, for hip and joint orthopedic surgeons employed by hospitals the national 90th percentile compensation was $1,192,056 and the national median compensation was $631,527.  NCH paid Dr. Kapp over $2.2 million.

75.     Dr. Kapp performs mostly knee and hip replacement surgeries in a patient population consisting of predominantly Medicare patients.  Dr. Kapp's compensation should reflect Medicare reimbursement rates for hip and joint surgeries. Instead his $2.2 million salary per year reflects revenues from referrals.

76.     An orthopedic surgeon in Naples that is as busy as Dr. Kapp might have a salary of approximately 1 million.  Dr. Kapp's personal production and the collections for his services do not justify compensation over $2.2 million each year. Another orthopedic surgeon in Naples does

17

approximately 20% less joint replacements than Dr. Kapp, yet he makes less than half of the money that Dr. Kapp receives from NCH each year.

77.    Likewise, NCH has compensated another hip and joint orthopedic surgeon, Dr. Jon Dounchis, at levels far in excess of the national 90th percentile. In 2013 and 2014, NCH paid Dr. Dounchis in excess of 1.5 million dollars each year as compared to the national 90th percentile of $1,206,711 and $1,192,056 in such years.

78.    NCH has paid this excessive compensation to orthopedic surgeons based in part on the value of ancillary revenues generated by these physicians for surgeries and services at NCH hospitals and clinics.

79.    Both Dr. Kapp and Dr. Dounchis have treated and referred a substantial population of Medicare patients at NCH hospitals and clinics.

80.    NCH's executives knew that the excessive compensation of the orthopedic surgeons generated losses each year, yet NCH's executives closely tracked and monitored offsetting revenues from referrals by the employed orthopedic surgeons to NCH hospitals and clinics.

## NCH Has Excessively Paid Physicians in Numerous Other Specialties Based in Part on the Value of Their Referrals to NCH Hospitals and Clinics

81.    NCH has also over-compensated internal medicine physicians and family medicine physicians based in part on consideration of the value of their referrals to NCH hospitals and clinics. For example, NCH has paid Dr. Karen Henrichsen, an internal medicine physician formerly employed by Anchor Health, approximately $450,000 in 2013 and again in 2014, despite the fact that the national 90th percentile according to MGMA data was $368,687 in 2013 and $398,805 in 2014.

18

82.    The national median compensation for internal medicine physicians employed by hospitals was $224,317 in 2013 and $233,362 in 2014. NCH has paid Dr. Henrichsen at levels that are approximately double the national median for internal medicine physicians employed by hospitals.

83.    NCH has paid another former Anchor Health family medicine physician, Dr. Robert Hanson, at levels far in excess of the 90th national percentile according to MGMA data. In 2013 and 2014, NCH paid Dr. Hanson approximately $475,000 despite the fact that the national 90th percentile for family medicine physicians employed by hospitals was $339,357 in 2013 and $349,957 in 2014.

84.    Dr. Hanson's compensation at $475,000 dwarfs the national median compensation for family medicine physicians employed by hospitals which was $209,965 in 2013 and $219,226 in 2014 according to MGMA data.

85.    NCH has also excessively paid employed gastroenterologists. In 2013 and 2014, NCH paid Dr. Jan Barrios, a gastroenterologist approximately $950,000. This compensation is nearly $200,000 above the national 90th percentile for gastroenterologists employed by hospitals ($760,815 in 2013 and $810,552 in 2014).

86.    Dr. Barrios' salary was nearly double the national median for gastroenterologists employed by hospitals in 2013 and 2014 according to MGMA data.

87.    NCH has also excessively paid infectious disease physicians. For example, NCH paid Dr. Gary Bergen, an infectious disease specialist, approximately $746,000 in 2013 and over $720,000 in 2014.

88.    The payments to Dr. Bergen were *nearly double the national 90th percentile* for infectious disease physicians employed by hospitals in the United States.

19

89.   In 2013, the national 90th percentile compensation for infectious disease physicians employed by hospitals was $378,500 according to MGMA data. In 2014, the national 90th percentile compensation was $384,502. The national median compensation for hospital-employed infectious disease specialists was $245,401. NCH paid Dr. Bergen nearly $500,000 a year above the national median.

90.   NCH has also paid psychiatrists at excessive levels based on the value of referrals. In 2013, NCH paid Dr. Damian McGovern over $640,000. Similar to others, *this salary is nearly double the national 90th percentile compensation* for psychiatrists employed by hospitals ($386,208).

91.   All of these employed physicians who have been excessively compensated are sources of significant referrals of Medicare patients to NCH hospitals and clinics.

92.   These employed physicians receiving payments far above the national 90th percentile do not manage workloads that would justify such payments. They do not generate collections for their personal services that justify compensation at such extraordinary levels. One economic basis for their compensation---far in excess of the national 90th percentile--- was revenues from referrals by these physicians to NCH hospitals and clinics.


### NCH's Excessive Payments to Certain Employed Physicians Have Generated Losses of Over 60 Million Dollars During the Last Five Years

93.   Since implementing their strategy in late 2010, NCH's excessive payments to certain employed physicians have generated significant annual losses for NCH if revenues from referrals were not considered.  NCHMD or NCH Physician Group operated at a loss over $13.2 million in 2012, over $14 million in 2013, and approximately $12 million in 2014.

94.    Each year Naples Community Hospital and NCH Healthcare made financial transfers to NCHMD to cover the operating losses from the excessive payments to employed physicians.

95.    NCH deliberately planned for such losses as part of their strategy to reward certain physicians for referrals with revenues that more than offset the losses. The losses were the calculated costs of NCH's scheme. NCH's executives anticipated and tracked the losses from excessive physician compensation as they projected, monitored, and pressured physicians for the offsetting profits from referrals.

## NCH Has Violated Federal *Stark* Laws

96.    Under a scheme of mutual enrichment, NCH has paid certain employed physicians far in excess of the value of their personal services while NCH received substantial profits from inpatient and outpatient referrals by these physicians.

97.    NCH has compensated certain employed physicians (1) at levels which far exceeded the fair market value of their personal services, (2) at levels which were not commercially reasonable if the physicians were not in a position to generate referral business for NCH, and (3) at levels which were determined and paid based on the volume and value of inpatient and outpatient referrals by such physicians to NCH hospitals and clinics.

98.    NCH has knowingly and repeatedly violated Federal *Stark* and Anti-kickback laws discussed below and has knowingly submitted thousands of false claims to Federal Health Care Programs[4] which claims arose through tainted referrals from employed physicians receiving excessive payments from NCH.

---

[4]Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs in addition to federal employees and retired federal employees.

99.   The Federal *Stark* Law "was enacted to address over-utilization, anti-competitive behavior, and other abuses of health care services that occur when physicians have financial relationships with certain ancillary service entities to which they refer Medicare or Medicaid patients." 69 Federal Register 16124 (March 26, 2004).

100.   "The approach taken by the Congress in enacting section 1877 of the Act is preventive because it essentially prohibits many financial arrangements between physicians and entities providing DHS." 66 Federal Register 859. "Specifically, Section 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of FFP under the Medicaid program) for certain DHS when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions." *Id.*

101.   Congress enacted the *Stark* Statute in two parts, commonly known as *Stark I* and *Stark II.* Enacted in 1989, *Stark I* applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

102.   In 1993, Congress extended the *Stark* Statute (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.   As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies;

22

(9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

103.  The *Stark* Law broadly defines prohibited "financial relationships" to include "compensation arrangements" in which any "remuneration" is paid by a hospital to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn (a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).

104.   The *Stark* Law broadly defines a prohibited "compensation arrangement":

> (A) The term "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and any entity other than an arrangement involving only remuneration described in subparagraph (C).
> (B) The term "remuneration" includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind.

> 42 U.S.C. § 1395nn(h)(1).

105.   This language makes clear that Congress intended the definition of "financial relationship" to include any type of financial relationship in which physicians receive any remuneration or any kind from a hospital, directly or indirectly, overtly or covertly.

106.   The *Stark* Law provides that if a physician has a financial relationship with a hospital or entity, then:

> (A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

> 42 U.S.C. § 1395nn (a)(1).

107.   In addition to prohibiting the hospital from submitting claims under these circumstances,

the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[5] If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

### The *Stark* Statute's Broad Definition of "Referral"

108.   The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A).

109.   The accompanying regulations applying the *Stark* Statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

110.   As discussed above, the *Stark* Statute broadly defines prohibited "financial relationships"

---

[5] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

to include any "compensation" paid directly or indirectly to a referring physician. The *Stark* Statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. To avoid the referral and billing prohibitions in the *Stark* Statute, a hospital's financial relationship with a physician must satisfy one of the exceptions.

111.    Once the plaintiff or the government has established proof of each element of a violation under the Act, the burden shifts to the defendant to establish that the conduct was protected by an exception. If no exception applies to a *Stark* violation, then all referrals from the referring employed physician to the DHS entity are subject to prohibition.

### A Bona Fide Employment Relationship Must Satisfy Four Primary Requirements

112.    A hospital employing and paying a physician who makes referrals to that hospital of Medicare and Medicaid patients must satisfy the statutory exception for "bona fide employment relationships." Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

### Physician Compensation Must be "Consistent with the Fair Market Value of the Services" Personally Performed by the Physician

113.    In pertinent part, the statutory language focuses on "the fair market value of the services" personally performed by the physician.  42 U.S.C.S. § 1395nn (e)(2).

114.    "[S]ection 1877 of the Act contemplates that physicians---whether group practice members, independent contractors or employees---**can be paid in a manner that directly correlates to their own personal labor...**" 66 Federal Register 876 (emphasis added). "In the case of...employees under the *bona fide* employment exception, the amount of compensation for personal productivity is limited to fair market value for the services they personally perform." *Id.* **"In other words, 'productivity,' as used in the statute, refers to the quantity and intensity of a physician's own work, but does not include the physician's fruitfulness in generating DHS performed by others..."** *Id.* (emphasis added).   "The fair market value standard in these exceptions acts as an additional check against inappropriate financial incentives." *Id.*

115.    The *Stark* Statute provides that "[t]he term 'fair market value' means the value in arm's length transactions, consistent with the general market value . . ." 42 U.S.C. § 1395nn(h)(3). Federal regulations amplify this definition as follows:

> Fair market value means the value in arm's-length transactions, consistent with the general market value. "General market value" means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers *who are not otherwise in a position to generate business for the other party*, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement *who are not otherwise in a position to generate business for the other party*, on the date of acquisition of the asset or at the time of the service agreement." 42 C.F.R. § 411.351 (emphasis added).

116.    The *Stark* Statute "establishes a straightforward test that compensation arrangements should be at fair market value for the work or service performed....not inflated to compensate for the physician's ability to generate other revenues." 66 Fed. Reg. at 877 (emphasis added).

26

**Physician Compensation Must Not be "Determined in a Manner that Takes into Account (Directly or Indirectly) the Volume or Value of Referrals by the Referring Physician"**

117.   The *Stark* Law also requires that "the amount of the remuneration under the employment...is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. § 1395nn (e)(2).

118.   If physicians are paid "per service" or "per time period," the "per service" amount "must reflect fair market value at inception not taking into account the volume or value of referrals and must not change over the term of the contract based on the volume or value of DHS referrals..." 66 Federal Register 878.  Compensation based on a unit of service or time must be "fair market value for services or items actually provided" and personally performed by an employed physician. 69 Federal Register 16069.

119.   Apparent fixed payments to physicians may also violate Federal *Stark* laws. "If the payments reflect or take into account non-personally performed services, they may raise concerns under the statute and would merit case-by-case determination, regardless of the apparent fixed determination." 69 Federal Register 16088.

120.   The *Stark* Statute prohibits a hospital from determining compensation "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. § 1395nn (e)(2). NCH has repeatedly and deliberately violated this Federal law.

**The *Stark* Statute Requires that Physician Compensation Must be "Commercially Reasonable Even if No Referrals Were Made to the Employer"**

121.   The *Stark* Statute also requires that the remuneration to an employed physician must be "provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

27

122.  "An arrangement will be considered 'commercially reasonable' in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals." 69 Federal Register 16093.

123.  A negotiated agreement between interested parties does not by definition reflect fair market value. The *Stark* Laws are predicated on the recognition that, when one party is in a position to generate business for the other, negotiated agreements between such parties are often designed to disguise the payment of compensation in excess of fair market value.

**The Anti-Kickback Statute Also Mandates that a Hospital's Payments to an Employed Physician Must be Consistent with the Fair Market Value of the Physician's Services and Must Not Take Into Account the Volume or Value of Referrals to the Hospital**

124.  The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare, Medicaid, and TRICARE programs.

125.  The Anti-Kickback Statute prohibits a hospital from offering or paying "any remuneration...directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to...refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

126.  The United States Department of Health and Human Services ("HHS") has promulgated regulations specifying those payment practices that will not be subject to criminal prosecution or

provide a basis for administrative exclusion. The "Safe Harbor" regulations, 42 C.F.R. §
1001.952, list various circumstances under which a financial relationship between a provider and
a referral source would not trigger liability under the Anti-Kickback Statute.

127.    Payments to a physician under a personal service agreement must be "set in advance,
[must be]... consistent with fair market value in arms-length transactions and [must]...not [be]
determined in a manner that takes into account the volume or value of any referrals or business
otherwise generated between the parties for which payment may be made in whole or in part
under Medicare or a State health care program." 42 C.F.R. § 1001.952(d) (2000).

128.    The Federal Anti-Kickback Statute arose out of Congressional concern that payoffs to
those who can influence health care decisions would result in goods and services being provided
that are medically unnecessary, too costly, poor quality, or even harmful to a vulnerable patient
population. The Anti-Kickback Statute was partially based on studies demonstrating that
physicians, even those intending to act in good faith, were likely to refer significantly more
patients when there is a financial incentive to generate business.

129.    To protect the integrity of Federal Healthcare Programs, and realizing the difficulty for
regulators and law enforcement to review every case for medically unnecessary procedures,
Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless
of whether the kickback gave rise to overutilization or poor quality of care.

130.    "If any one purpose of remuneration is to induce or reward referrals of Federal health
care program business, the [Anti-kickback] statute is violated." 66 Federal Register 919.

131.    First enacted in 1972, Congress strengthened the Anti-Kickback Statute in 1977 and
1978 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.
*See* Social Security Amendments of 1972, Pub. L. No. 92-603, 242(b) and 9c); 42 U.S.C. §

1320a-7b, Medicare Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

132.   The *Stark* Laws and the Anti-Kickback Statute are "complementary and although overlapping in some aspects, not redundant." 66 Federal Register 863.   "We believe the Congress intended to create an array of fraud and abuse authorities to enable the government to protect the public fisc, beneficiaries of Federal programs, and honest health care providers from the corruption of the health care system by unscrupulous providers." *Id.*   "Congress only intended [the *Stark* laws] to establish a minimum threshold for acceptable financial relationships, and that potentially abusive financial relationships that may be permitted under Section 1877 of the Act could still be addressed through other statutes that address health care fraud and abuse, including the anti-kickback statute (Section 1128B(b) of the Act)." 66 Federal Register 860.

133.   Violation of the Anti-Kickback Statute may subject the perpetrator to exclusion from participation in Federal Healthcare Programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

**Federal Healthcare Programs**

**Introduction to the Medicare Program**

134.   Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs discussed below in addition to federal employees and retired federal employees.

135.   Since 2011, NCH has received over 700 million dollars from the Medicare Program.

Payments from the Medicare Program account for approximately 54-55 percent of NCH's revenues each year. Payments from the Medicaid Program account for another 7-8 percent each year.

136. A significant portion of such payments from the Medicare Program derived from inpatient and outpatient referrals by employed physicians receiving excessive payments from NCH as described above.

137. Between 2011 and the present, NCH has submitted thousands of claims both for specific services provided to Medicare beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

138. The Medicare Program covers the costs of certain medical services for persons aged 65 years or older and those with disabilities.

139. The Medicare Program is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

140. HHS is responsible for the administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

141. Under the Medicare Program, CMS makes payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in the Medicare Program. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

31

142.   NCH has executed at least one provider agreement with CMS in which it agreed to abide by the Medicare laws, regulations and program instructions..." CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B.

143.   In the provider agreement, NCH certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulation and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)..." *Id.*

144.   To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

145.   Hospitals submit claims for interim reimbursement for items and services delivered to Medicare beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-04.

146.   As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. As discussed above and below, each cost report contains mandatory certifications of compliance with *Stark* and Anti-Kickback Laws.

147.   After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R.

§§ 405.1803, 413.60 and 413.64(f) (1).

148.   NCH was required to submit cost reports to their fiscal intermediary for each Fiscal Year between 2011 and the present.

149.   Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically UB-04 Forms) during the course of the fiscal year. On the cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

150.   At all times relevant to this Complaint, the Medicare Program, through its fiscal intermediaries, had the right to audit the cost reports and financial representations made by NCH to ensure their accuracy and protect the integrity of the Medicare Program. This includes the right to adjust cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

151.   Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

152.   For each of the Fiscal Years between 2011 and the present, each cost report certification page submitted by NCH included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or**

**imprisonment may result."** (Emphasis added).

153.   On each cost report for each Fiscal Year from 2011 through the present, the responsible officer of NCH was required to certify, in pertinent part, as follows: "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report....and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."** (Emphasis added).

154.   NCH was required to certify that their filed cost reports were  (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, **(4) that the services provided in the cost report were not linked to kickbacks, and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the *Stark* and Anti-Kickback Statutes.**

155.   NCH was also required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b (a) (3) specifically confirms the duty to disclose known errors in cost reports. "Whoever....having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than

is due or when no such benefit or payment is authorized...shall in the case of such a ....concealment or failure...be guilty of a felony."

156.   In the months following the end of each fiscal year, NCH submitted annual cost reports to the Centers for Medicare and Medicaid Services (CMS) and attested to the certifications stated above. NCH submitted cost reports with the certifications stated above for Fiscal Years 2011, 2012, 2013, and 2014 and will submit a similar cost report for 2015.

157.   CMS issued a Notice of Provider Reimbursement (NPR) based on the financial data submitted in the cost reports by NCH for each Fiscal Year.

158.   In accordance with 42 C.F.R. § 415.1885, a cost report may be reopened within three (3) years of the Notice of Program Reimbursement date. The Federal regulations establish that the cost report may be reopened due to false claims or if the provider has provided inaccurate cost report data.

159.   After the submission of their cost reports each year to CMS, NCH had ongoing duties and opportunities to request the reopening of their previous cost reports which contained false information submitted to Federal healthcare programs.

160.   In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

161.   Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

162.   By submitting CMS-1500 forms, physicians and physician groups certify that they are

35

eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the Program, such as the *Stark* and Anti-Kickback Laws.

### Introduction to Medicaid Program

163.   The Medicaid Program is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

164.   The Federal Medicaid statute sets forth minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq*.  As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

*165*.   The Federal matching rate for the Florida Medicaid Program is approximately 61 percent. *www.statefhealthfacts.org.*

166.   "Section 13624 of OBRA 1993, entitled 'Application of Medicare Rules Limiting Certain Physician Referrals,' added a new paragraph (s) to section 1903 of the Act, that extends aspects of the Medicare prohibition on physician referrals to Medicaid." 66 Federal Register 857. "This provision bars FFP in State expenditures for DHS furnished to an individual based on a physician referral that would result in denial of payment for the services under the Medicare

program if Medicare covered the services to the same extent and under the same terms and conditions as under the State Medicaid plan." 66 Federal Register 858.

167. "The statute also made certain reporting requirements in section 1877(f) of the Act and a civil monetary penalty provision in section 1877(g)(5) (related to reporting requirements) applicable to providers of DHS for which payment may be made under Medicaid in the same manner as they apply to providers of such services for which payment may be made under Medicare." 66 Federal Register 858.

168. In Florida, provider hospitals participating in the Medicaid Program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

169. Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the *Stark* and Anti-kickback laws.

170. The Florida Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

171. Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with Federal *Stark* and Anti-Kickback Laws. The Florida Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims submitted by NCH .

## Introduction to TRICARE

172. NCH was also enrolled in and sought payments from the Civilian Health and Medical

37

Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

173. TRICARE is a federally-funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a). NCH has received revenue from the TRICARE Program.

174. In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6.

175. A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

176. The Request for Reimbursement requires that the provider certify that the information contained therein is "is accurate and based upon the hospital's Medicare cost report."

177. Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

178. NCH submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports of NCH contained false information

or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

179.   On each occasion when NCH 's Requests for Reimbursement were false due to falsity in its Medicare cost reports, NCH falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

180.   NCH knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.[6]

## Introduction to the False Claims Act

181.   The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material[7] to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[8] to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

---

[6] Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs in addition to federal employees and retired federal employees.

[7] "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

[8] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

182.    The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that...is presented to an officer, employee or agent of the United States...or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government...provides or has provided any portion of the money or property requested or demanded...or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

183.    Statutory liability under the False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

184.    Under the Federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

185.    In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required. *Id.* Under the False Claims Act, a defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information." *Id.*

186.    Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in Federal Healthcare Programs have a duty to familiarize themselves with the legal requirements for payment and ensure compliance. A

defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question. Likewise, a defendant who fails to verify and evaluate the accuracy of information or investigate the accuracy of information when on notice of questions concerning the accuracy of such information acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

187. The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009. "The amendments made by this section shall take effect on the date of enactment of the Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729 (a) (1), as added by subsection (a) (1) shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729) that are pending on or after date..." FERA, § 4(f). The conduct identified in this Complaint occurred after the enactment of FERA. The illegal conduct identified in this Complaint spans 2011 through the present and is ongoing.

188. On March 23, 2010, the President of the United States signed the Patient Protection and Affordability Care Act, Pub. L. 111-148, 124 Stat. 119, which broadened the reach of the False Claims Act. The illegal conduct identified in this Complaint occurred after such amendment to the False Claims Act.

189. Under the amended False Claims Act, the public disclosure defense is no longer a jurisdictional bar. Rather, it is an affirmative defense that automatically fails if opposed by the government.

190. 31 U.S.C. § 3730(4)(A), as amended in March of 2010, governs this action and provides as follows,

(4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing,            audit,            or            investigation;            or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

191.   Even in the presence of a public disclosure as defined in the amended False Claims Act, the complaint is not subject to dismissal if the whistleblower is an "original source."

192.   Under the amended False Claims Act, "original source" is redefined. Previously, an "original source" must have had "direct and independent knowledge of the information on which the allegations are based," *and* voluntarily provided the information to the Government before filing suit based on such information. As amended, an "original source" must either: (i) prior to a public disclosure, have voluntarily disclosed to the Government the information on which allegations or transactions in the claim are based, *or* (ii) have knowledge that is independent of, and that materially adds to, the publicly disclosed allegations or transactions, and have voluntarily provided the information to the Government before filing an action.

193.   In this action there has been no public disclosure as defined by the amended False Claims Act. Dr. Vensel would satisfy the original source exception even if there was such a public disclosure.

**Certifying Compliance with the Federal Stark Laws and Anti-Kickback Statutes Is
Condition of Payment Under Federal Healthcare Programs and False Certifications are
Actionable under the False Claims Act**

194.   Federal law establishes that falsely certifying compliance with the Anti-Kickback
Statute, 42 U.S.C. § 1320a-7b (b), and *Stark* Statute, 42 U.S.C. § 1395nn, in a Medicare cost
report is actionable under the False Claims Act. False claims to Medicare, including Medicare
cost reports and UB-04 forms[9] are actionable under the False Claims Act. The submission of
UB-04 forms in violation of the *Stark* Statute constitutes a violation of the False Claims Act.

195.   The *Stark* Laws state that compliance is a mandatory condition of Medicare payments.
Likewise, compliance with the Anti-Kickback Statute is a mandatory condition of payment by
the Medicaid Program. 42 U.S.C. § 1320a-7b (b).

196.   On their annual cost reports submitted to CMS for each of the fiscal years in question,
NCH has certified that none of the services billed Federal health care programs were "provided
or procured through the payment directly or indirectly of a kickback." Each cost report states, **"If
services identified in this report were provided or procured through the payment directly
or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative
action, fines and/or imprisonment may result."** (Emphasis added).

197.   For each year from 2011 through the present, the annual cost report was signed by a
NCH officer or administrator who certified **"that I am familiar with the laws and regulations
regarding the provision of health care services and that the services identified in this cost
report were provided in compliance with such laws and regulations."** (Emphasis added). The
certifications were a prerequisite to payment under Federal Healthcare Programs. NCH 's
express certifications were and continue to be knowingly false for the reasons stated in this

---

[9]     The UB-04 form is a claim form for hospitals to submit claims for payment to the
Medicare Program.

Complaint.

198. NCH has also violated the Federal False Claims Act through other certifications of compliance with the Anti-Kickback Laws and *Stark* Statute, which certifications are prerequisites to enrollment in Federal Healthcare Programs and Defendants' receipt of Medicare and Medicaid payments.

199. The enrollment application that providers must execute to participate in the Medicare program, Form CMS-855A, contains the following certification: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."** (Emphasis added).

200. After violating the Federal *Stark* and Anti-Kickback Laws, NCH violated the Federal False Claims Act through their knowingly false express and implied certifications which were conditions of payment from Federal Healthcare Programs.

201. For the time period of claims arising from 2011 through the present, NCH has submitted thousands of claims to Federal Healthcare Programs which claims represent referrals from employed physicians receiving excessive compensation in violation of Federal *Stark* and Anti-Kickback Laws.

202. NCH is exclusively in possession of the entire body of evidence exposing their violations of *Stark* and Anti-Kickback laws.

203. NCH is in possession of the UB-O4 forms, Medicare Cost Reports and corresponding Medicaid or TRICARE forms used to make claims for services arising from referrals from employed physicians receiving excessive compensation from NCH.

204. Additionally, NCH's certifications of compliance with Federal *Stark* and Anti-Kickback Laws were express conditions of all payments made by Federal Healthcare Programs between 2011 and the present.

## Count I—Federal False Claims Act 31 U.S.C. § 3729(a) (1)(A)

205. Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

206. In pertinent part, the False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

207. NCH knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

208. This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

209. Through the acts described above, NCH knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

210. The United States was unaware of the falsity of the records, statements and claims made

or caused to be made by NCH. In reliance on the accuracy of the claims, information, records, and certifications submitted by NCH, the United States paid and continues to pay claims that would not be paid if NCH's unlawful conduct was known to the United States.

211.   As a result of the NCH's acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

212.   Additionally, the United States is entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

### Count II—False Claims Act 31 U.S.C. § 3729(a)(1)(B) Use of False Statements

213.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

214.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

215.   This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

216.   Through the acts described above, NCH knowingly made, used, or caused to be made or used, false records and statements, i.e., the false certifications made by NCH in submitting their Cost Reports after each fiscal year to get false claims paid or approved by the United States. Through the acts described above, NCH knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B). The records were false in that they purported to show compliance with federal *Stark* and Anti-kickback statutes.

217.  NCH knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States.  The statements were made knowingly because the hospital knew, or in the exercise of reasonable care should have known that its payments to employed physicians violated federal Stark and Anti-kickback statutes.

218.  The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by NCH. The United States paid and continues to pay claims that would not be paid if NCH's  unlawful conduct was known.

219.  By virtue of the false records or false claims made by NCH, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

220.    Additionally, the United States is entitled to civil penalties between $5,500 and $11,000 for each false claim made and caused to be made by NCH  arising from their unlawful conduct as described herein.

### Count III—31 U.S.C. § 3729(a)(1)(C) Conspiring to Submit False Claims

221.  Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

222.  In pertinent part, the False Claims Act establishes liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."  31 U.S.C. § 3729(a)(1)(C).

223.  This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

224.  Through the acts described above, NCH acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

225.  NCH conspired to withhold information regarding excessive compensation to physicians and illegal incentives to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to NCH.

226.  As a result, the United States was unaware of the false claims submitted and caused by Defendants and the United States paid and continues to pay claims that would not be paid if the Defendants' unlawful conduct was known to the United States.

227.  By reason of NCH's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

228.  By virtue of Defendants' conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count IV—Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B)

229.  Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

230.  In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material

to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

231.   Compliance with *Stark* and Anti-kickback Laws were explicit conditions of payment under Federal Healthcare Programs. For each of the years between 2011 and the present, Defendants certified compliance with Federal *Stark* and Anti-kickback Laws on their annual cost reports submitted to Federal Healthcare Programs.

232.   NCH's certifications of compliance with Federal *Stark* and Anti-kickback Laws were knowingly false.

233.   In reliance on the NCH's express and implied certifications, the United States made payments to Defendants under Federal Healthcare Programs. If the United States had known that Defendants' certifications were false, Federal payments under the Federal Healthcare Programs would not have been made to Defendants for each of the years in question.

234.   By virtue of the false records, false statements, and false certifications made by NCH, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count V—Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G)

235.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

236.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or

regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

237.   "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

238.   "The OIG may impose a penalty, and where authorized, an assessment against any person...whom it determines...[h]as not refunded on a timely basis....amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

239.   NCH has knowingly caused and retained overpayments from Federal Healthcare Programs arising from NCH 's violations of the *Stark* and Anti-Kickback Laws addressed above.

240.   By virtue of NCH 's causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other Federal Healthcare Programs, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count VI—U.S.C. § 3729(a)(1)(G) False Record to Avoid an Obligation to Refund

241.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

242.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

243.   NCH knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting

50

the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

244.   By virtue of the false records or false statements made by the NCH, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Prayers for Relief

245.   On behalf of the United States, Dr. Vensel requests and prays that judgment be entered against NCH in the amount of the United States' damages, trebled as required by law, such civil penalties as are required by law, for a qui tam relator's share as specified by 31 U.S.C. §3730(d), and for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d), and for all such further legal and equitable relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this the _10_ day of March, 2016.

Jonathan Kroner
FBN 328677
Jonathan Kroner Law Office
420 Lincoln Road Suite 248
Miami Beach, Florida 33139-3031
305.310.6046
jk@FloridaFalseClaim.com

**Lead Counsel:**
Bryan A. Vroon, Esq. (*Pro Hac* Admission Motion to be filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing Qui Tam

Relator's Complaint Under 31 U.S.C. §3729, Federal False Claims Act by depositing a true and

correct copy of same by Certified Mail in the United States Mail, postage prepaid, addressed as

follows:

The Honorable Attorney General Loretta E. Lynch
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

The Honorable A. Lee Bentley, III
Attention: Seal Clerk
United States Attorney for the Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa Florida
33602

This ___/()___ day of March, 2016.

Jonathan Kroner

52